LORRENE THOMAS, APPELLANT, v. FOREST M. NEVANS AND DONNIE MAE NEVANS, DOING BUSINESS UNDER THE NAME OF MIDWAY USED FURNITURE, RESPONDENTS.

No. 3582

February 14, 1950.                    215 P.2d 244.

*Pike, McLaughlin & Furrh,* of Reno, for Appellant.

*L. D. Summerfield,* of Reno, for Respondents.

## OPINION

By the Court, BADT, J.:

The main question presented by this appeal is: Was there sufficient evidence before the trial court to justify its finding and conclusion that plaintiff was estopped by her actions from questioning the authority of her former husband to sell the household furniture, owned by her as her separate property, to the defendants, who bought the same for value in good faith? We are of the opinion that there was. The facts are these.

One Duane Heeren, a former husband of plaintiff, and Heeren's parents had in 1940 or 1941, while the couple were living in California, given her certain household furniture as gifts. She and Heeren were divorced, and she married Robert Jackson Maynard, April 22, 1944, and had the furniture moved to their rented living quarters at 767 Morrill Ave., Reno. Less than six months thereafter, on October 2, 1944, she secured a divorce from Maynard on the ground of extreme cruelty, and the court's findings of fact were to the effect that the couple owned no community property, but that the household furniture (the same here in question) was the wife's separate property. Neither the conclusions of law nor the decree in that case made mention thereof. After the divorce Maynard vacated the premises but she continued to live there. Three weeks later Maynard moved back, and they lived there together for over a year, till October 28, 1945. Plaintiff described the situation as follows: "Well, to begin with, when we were divorced, he moved out, and three weeks later moved back in, and beat me so I couldn't work after that for quite a while, and he told me that he was going to live there. Well, he kept me in such poor health that I was unable to do anything about it, and then, when Mr. Thomas and I were married (six days after her final separation from Maynard, November 3, 1945), why he refused to let me have the furniture, and when I did go out to get it, December 6th of 1945, he dismissed the van—Nevada Transfer van, and beat me rather severely at that time. And he threatened me continuously; from the time when we were divorced, until I was married to Mr. Thomas, I lived in constant fear of him." Till October 28, 1945, she was known as Mrs. Maynard, and did not exercise the right, given her in her divorce decree, to resume the name of Heeren. Sometimes she paid the rent, sometimes Maynard paid it. She filed no inventory of her separate property.[1]

[1] Sec. 3357, N.C.L. "A full and complete inventory of the separate property of the wife * * * must be made out and signed by her

Forest M. Nevans and his wife, Donnie Mae Nevans, the defendants, operated the Midway Used Furniture company in Reno. About July 17, 1944, Maynard, plaintiff's husband, came into the furniture store and purchased a bed, springs and mattress from Nevans on which he paid $5 down and agreed to pay the balance of $20 on delivery. Nevans delivered the bed, springs and mattress on that day to 767 Morrill Avenue in Reno, and the plaintiff, then Mrs. Maynard, paid him the balance. Nevans testified to the following conversation with Mrs. Maynard on that occasion:

"Q. And now at that time, on July 17th, 1944, when you delivered that bed with the springs and mattress, and received a balance on it, did you have any conversation with Mrs. Maynard about anything else? A. Yes. She told me that she had a dining-room set that was stored in the garage and wanted me to take a look at it. And we went out the front door, and into this little side garage, and I said, 'Well, you better sell it, or do something with it, because it is going to go to pieces sitting here in the garage like that.'

"And she asked me to give her a price on it, and I made her an offer, and she says, 'Well, I can't sell my furniture without talking to my husband. I will give you a ring later.'

"Well, I never heard anything from her. That was the last I ever heard from her."

The dining-room set referred to was part of the furniture in question in this case. On different occasions after this transaction Nevans saw Mrs. Maynard around the yard a few times. Neither Mr. nor Mrs. Nevans had ever heard that the Maynards had been divorced. On March 29, 1946, Maynard came to the Midway Store and

* * * and shall be recorded * * * in the office of the recorder of the county in which she resides * * *."

Sec. 3359, N.C.L. "When the wife is a resident of this state, the failure to file for record an inventory of her separate property * * * is prima facie evidence, as between the wife and purchasers in good faith and for a valuable consideration from the husband, that the property * * * is not the separate property of the wife * * *."

told Nevans that he had some furniture in the warehouse, whereupon Nevans went, to the warehouse with Maynard, looked at the furniture, which included the dining-room set he had previously examined, and agreed to purchase the furniture for $550, plus $29.52 storage charges, and paid these amounts in two checks, one to Maynard and one to the storage company. On the following day the plaintiff, having been informed that her furniture was at the furniture store, went to the store and saw the furniture there. Mrs. Nevans asked her if she were not Mrs. Maynard and she replied, "No, I am not, nor have I ever been." She said that she was Mrs. Thomas and that she knew Mrs. Maynard and that Mrs. Maynard wouldn't do anything about it. Upon being asked by Mrs. Nevans what interest she had in the furniture, she said that she had none whatever but that she was there in the interest of a friend. Plaintiff advised Mrs. Nevans not to sell the furniture and then consulted her attorney, who telephoned the furniture company not to sell the furniture because it "was going through court action." This was confirmed by a letter from plaintiff's attorney to the defendants. As required by a Reno city ordinance, the defendants listed with the chief of police the furniture thus purchased by them. This ordinance required that secondhand furniture thus purchased must be held at least three days before sale. The defendants reconditioned the furniture and sold it some four or six weeks later to other persons at a profit of about $420.

The plaintiff filed a replevin action against Maynard on March 18, 1946, alleging that he had converted her separate property and had placed some of it in storage in Reno, Nevada. She was unable to locate Maynard for service. She did not know where the property was until she found it at the store of defendants.

The trial court found that the actual and fair value of the property was $975; that from April 22, 1944 until November, 1945, plaintiff and Maynard lived together as husband and wife at 767 Morrill Avenue; and that

defendants knew that plaintiff and Maynard were so living together; that when defendants bought the property they believed in good faith that it was the community property of plaintiff and Maynard; and "that at all times subsequent to the marriage of plaintiff and said Robert Jackson Maynard on the 22d day of April, 1944, to and including the date of the purchase of said household goods from said Robert Jackson Maynard by defendants on said 29th day of March, 1946, the plaintiff, to the knowledge of the defendants, permitted said Robert Jackson Maynard to have the control of said household goods, and by her conduct, actions and statements to represent that said household goods were the community property of plaintiff and said Robert Jackson Maynard."

Appellant attacks the sufficiency of the evidence to sustain these findings. The briefs of both parties devote considerable attention to their respective constructions of plaintiff's statement to Nevans at the time plaintiff and her husband purchased the bed, springs and mattress. She said, "Well, I can't sell my furniture without talking to my husband. I will give you a ring later." Appellant, with emphasis on the word "my," insists that this was definite information to Nevans that it was her separate property. Respondents, with emphasis upon plaintiff's statement that she could not sell "without talking to my husband," insist that this was just as definitely a statement that the furniture was community property and that the use of the word "my" is simply the common use under which both husband and wife refer to "my house," "my car," "my furniture" and even "my children." Appellant argues that when plaintiff said that she could not sell her furniture until she talked to her husband, this simply indicated that "she, like any other good wife, desired to discuss the matter with her husband before selling the same." The matter of the emphasis on the exact words used may not be too convincing either way. The testimony as to this conversation was given at the trial in May, 1948, almost

four years after the conversation took place, and it is extremely unlikely that the precise words used could have been remembered by any of the parties with any extreme degree of accuracy. Nevans however testified at the trial that when he subsequently bought the furniture from Maynard he did not get in touch with Mrs. Maynard, because Maynard "had the furniture. She (Mrs. Maynard) told me at one time she couldn't sell the dining-room set of the furniture without talking it over with him. When I saw the same furniture in there, I saw no need in getting in touch with her, because it was in the warehouse. It was part of the same furniture she showed me out on Morrill * * * July 17, 1944 * * * and it was for that reason * * * I went ahead and bought the furniture * * * because I had made a price on it once before, on part of it, and he told me that they were planning to take the money and take over some crap table in Las Vegas * * * and he needed the money to have a bankroll to open up the crap table with."

■■ There is no doubt but that the furniture (Nevada constitution, article IV, section 31; N.C.L., sec. 3355) was the plaintiff's separate property of which she could not be divested without her consent, unless by her conduct she was estopped from denying Maynard's authority to sell it. It is equally clear that the wife may, without her husband's consent, dispose of her separate property.[2] But it has been generally recognized that she may be, by her actions, estopped from claiming lack of authority in her husband to dispose of it. 26 Am.Jur 738, Husband and Wife, Estoppel, sec. 114; 41 C.J.S., Husband and Wife, sec. 266, page 746. It is true that the plaintiff did not forfeit her separate property by her failure to record an inventory as required by sec. 3357, N.C.L., heretofore quoted in note 1. Her failure to record the inventory could however be properly considered by the court as one circumstance to be considered

[2] N.C.L., sec. 3363. "The wife may, without the consent of her husband, convey, charge, encumber, or otherwise in any manner dispose of her separate property."

with the other evidence in the case. Petition of Fuller, 63 Nev. 26, 159 P.2d 579. This is particularly so under the mandatory provisions of the Nevada statute in contrast with the permissive provisions of other states. See, for example, Anderson v. Medbery, 16 S.D. 324, 92 N.W. 1089.

It is significant too that our former statute, N.C.L., sec. 10337, providing for the restoration to the owner of all property obtained by larceny, robbery, burglary or embezzlement and that the owner "may maintain his action, not only against the felon, but against any person in whose possession he may find the property," was amended in 1935, Stats.Nev.1935, p. 370, to read: "All property obtained by larceny, robbery, burglary, or embezzlement, and found in the possession of the thief or embezzler thereof, or in the possession of any receiver of stolen property shall be restored to the owner."

The amendment, it will be noted, restored the defense of a good faith purchaser, in a proper case. It is true that these provisions occur under our Crimes and Punishment Act. We have however likewise adopted the Uniform Sales Act and have provided, in part, in sec. 6757, N.C.L.: "(1) Subject to the provisions of this act, where goods are sold by a person who is not the owner thereof, and who does not sell them under the authority or with the consent of the owner, the buyer acquires no better title to the goods than the seller had, unless the owner of the goods is by his conduct precluded from denying the seller's authority to sell. * * *"

■ While the evidence of estoppel is not so convincing as in many other cases, we are unable to say that the record is so devoid of substantial evidence as not to justify the court's finding. The impression gained by the court from its observation of the witnesses on the stand, their demeanor and their manner of testifying might well have been an important element that moved the court to the conclusion reached—strengthened, as this impression apparently was, by the other facts which

we have outlined. The weight to be given to this evidence was exclusively a matter for the trial court.

■ Appellant asserts that the replevin suit for the furniture instituted by plaintiff against her former husband Maynard, in some way operated as a notice of *lis pendens* so as to put these defendants on notice. The doctrine of constructive notice resulting from the filing with the county recorder of a notice of *lis pendens* applies, under N.C.L., sec. 8577, only to actions affecting real property. In any event, no notice of *lis pendens* was filed in the replevin suit.

■ Appellant also contends that the judgment in the divorce action of Maynard v. Maynard was constructive notice to all persons that this particular furniture became the plaintiff's separate property. It may be noted, first, that while it is true that the findings in the divorce action found that there was no community property and that the furniture at 767 Morrill Avenue was the plaintiff's separate property, neither the conclusions of law nor the judgment and decree made reference thereto. Secondly, the filing was restricted to the usual docketing and recording in the county clerk's office. Thirdly, only the judgment was so recorded in the office of the clerk. The authorities cited by appellant, in which recorded judgments in actions affecting real property were held to impart constructive notice to the parties and their privies, have no application here.

Appellant, in her contention that as the legal owner of the furniture she had at all events a right to recover the same from the defendants even though they acquired it in good faith for value from Maynard, relies upon Robertson v. C. O. D. Garage Company, 45 Nev. 160, 199 P. 356, and Robinson v. Goldfield Merger Mines Co., 46 Nev. 291, 206 P. 399, 213 P. 103. But in the latter case this court definitely recognized the application of the doctrine of estoppel in a proper case, and in the former refused to consider the doctrine of estoppel for the reason that it was raised for the first time on appeal, the case having

been tried in the trial court on the doctrine of actual authority conferred upon the agent by the owner.

Error is also assigned in the court's finding as to the value of the furniture. As we have concluded that the judgment denying any relief to plaintiff must be affirmed, the point becomes immaterial. We have given consideration to all points presented by appellant but find no error.

The judgment and the order denying plaintiff's motion for a new trial are affirmed with costs.

HORSEY, C. J., and EATHER, J., concur.